IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

ALEX F. SIMON,

        Plaintiff,

  v.                                    Civil Action 2:16-cv-259
                                          Judge Algenon L. Marbley
                                          Magistrate Judge Jolson

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION

Plaintiff Alex F. Simon filed this action under 42 U.S.C. §§ 405(g) seeking review of a final decision of the Commissioner of Social Security (the "Commissioner"), denying his application for disability insurance benefits. For the reasons that follow, it is **RECOMMENDED** that Plaintiff's statement of errors be **OVERRULED**, and that judgment be entered in favor of Defendant.

    I.      BACKGROUND

Plaintiff filed his applications for benefits on April 16, 2012, and his application for supplemental security income on July 4, 2012, alleging that he has been disabled since July 15, 2009. (Doc. 11, Tr. 78, 79, 188). On September 22, 2014, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (*Id.*, Tr. 18–38). On January 28, 2016, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (*Id.*, Tr. 1).

Plaintiff filed this case on March 25, 2016, and the Commissioner filed the administrative record on June 20, 2016. (Doc. 11). Plaintiff filed a Statement of Specific Errors on September

7, 2016 (Doc. 13), the Commissioner responded on October 26, 2016 (Doc. 14), and Plaintiff replied on November 9, 2016 (Doc. 15).

### A. Relevant Medical Records

#### 1. 2008

The medical records in this case begin when Plaintiff was hospitalized in April 2008 for complaints of chest and arm pain. (Doc. 11, Tr. 259–306). Findings on physical examination were generally unremarkable, although it was noted that Plaintiff's diabetes was not well controlled. (*Id.*, Tr. 263, 280–81). Follow-up catheterization and stenting of Plaintiff's heart in May 2008 stabilized his chest pain (*id.*, Tr. 307–08, 423), and Plaintiff was instructed to follow-up with a primary care doctor for diabetes and cholesterol management. (*Id.*, Tr. 308).

The next record is from roughly six months later when Plaintiff returned to the hospital in October of 2008, because, after standing for many hours at work, he had a seizure and passed out. (*Id.*, Tr. 316–59). On examination, Plaintiff appeared to be well and comfortable. (*Id.*, Tr. 321). Chest x-rays and a computed tomography (CT) of Plaintiff's brain were unremarkable. (*Id.*, Tr. 271). Clinicians thought it might have been a first-time seizure and advised Plaintiff to consult with his primary care physician. (*Id.*, Tr. 327). Heart catheterization in November 2008 showed 70 percent stenosis, fully corrected by angioplasty. (*Id.*, Tr. 423–24). A carotid Doppler study in December 2008 was essentially normal, with mild stenosis of right internal carotid artery. (*Id.*, Tr. 381).

#### 2. 2011

In July 2011, roughly two-and-a-half years after his catheterization and two years after his alleged onset of disability, Plaintiff saw primary care practitioner Perry Kalis, M.D., complaining of diabetes, chest pain, and anxiety. (*Id.*, Tr. 401). At that appointment, Plaintiff

stated that he had been without insurance for a year and a half and only recently received a medical card. (*Id.*, Tr. 401). He reported that he was not taking insulin or testing his blood sugar regularly, and he complained that fluoxetine was not helping his depression. (*Id.*, Tr. 401). Dr. Kalis found that Plaintiff's main problem was "that he has always been very noncompliant." (*Id.*, Tr. 401). The doctor referred Plaintiff to a cardiologist. (*Id.*, Tr. 383).

At a cardiology workup the next day, Plaintiff reported fatigue; shortness of breath; and left-side chest, throat, arm, and shoulder pain. (*Id.*, Tr. 383). Plaintiff said he had not pursued cardiac care because he was uninsured. (*Id.*, Tr. 383). On examination, he was alert and oriented, although anxious, with full range of motion in all extremities and regular rate and rhythm of heartbeat, with no murmurs or gallops. (*Id.*, Tr. 384–85). Angioplasty that day showed a well-preserved ventricular function and ejection fraction of 60 percent, with some stenosis. (*Id.*, Tr. 427). Steven Yakubov, M.D., elected to insert stents in response to Plaintiff's symptoms, which led to "an excellent result." (*Id.*, Tr. 427). After the procedure, Plaintiff was instructed not to lift anything heavier than five to ten pounds for one week. (*Id.*, Tr. 387).

Plaintiff followed up with Dr. Kalis in August 2011, reporting that Effexor was not helping his depression much. (*Id.*, Tr. 403). Dr. Kalis increased Plaintiff's dosage of Effexor and Lantus. (*Id.*, Tr. 402–03). The doctor noted that Plaintiff's diabetes was poorly controlled but wanted to check it again after two full months of medication compliance. (*Id.*, Tr. 403).

Four months later, in December 2011, Plaintiff returned to Dr. Kalis with several ailments. (*Id.*, Tr. 403, 405). Plaintiff complained of left-side chest pain, but Dr. Kalis thought it was "clearly musculoskeletal." (*Id.*, Tr. 405). Plaintiff also had a head tremor and hand tremor, but Dr. Kalis found the tremors to be very slight and too insignificant to warrant treatment. (*Id.*, Tr. 405). And, overall, Dr. Kalis observed that Plaintiff had been "very erratic" and

3

"noncompliant with medications," adding that, "Basically I think he is trying to make a case for disability. . . . Most of [his] problems [are] that he takes very poor care of himself." (*Id.*, Tr. 403, 405).

### *3. 2012*

In January 2012, Plaintiff returned to see Dr. Kalis and reported that he was unable to tolerate Buspar and thus was resuming Effexor for his depression. (*Id.*, Tr. 402). Three months later, in April 2012, Dr. Kalis noted that Plaintiff's depression and hypertension were under control. (*Id.*, Tr. 404). Then, in August 2012, Plaintiff returned to Dr. Kalis with additional complaints: hyperlipidemia, depression, diabetes, sciatica, heart disease, and carpal tunnel. (*Id.*, Tr. 407, 518). Dr. Kalis concluded that Plaintiff's depression and cholesterol issues were under control but noted that Plaintiff had very poor control over his diabetes. (*Id.*, Tr. 407). X-rays of Plaintiff's lumbar spine were unremarkable. (*Id.*, Tr. 414). The doctor ordered nerve conduction studies and referred Plaintiff to a cardiologist (*Id.*, Tr. 407). Nerve conduction studies the following week showed bilateral carpal tunnel syndrome, moderately severe on the right. (*Id.*, Tr. 434).

In September 2012, Plaintiff asked Dr. Kalis for a referral to a surgeon for carpal tunnel repair and requested an evaluation for sleep apnea. (*Id.*, Tr. 408, 495). A carotid duplex study that month showed minimal plaque and no stenosis of either carotid artery. (*Id.*, Tr. 431). A sleep study in October 2012 showed obstructive sleep apnea with excellent response to nasal bilevel positive airway pressure ("BiPAP") treatment. (*Id.*, Tr. 432–33, 520–21). Neurologist Robert Thompson, M.D., recommended that Plaintiff start BiPAP therapy, lose weight, and return in four to six weeks. (*Id.*, Tr. 432).

On October 31, 2012, psychologist John S. Reece, Psy.D., examined Plaintiff at the request of the Ohio Division of Disability Determination. (*Id.*, Tr. 418). During the examination, Plaintiff reported that he was laid off from his job as a quality production specialist and had been out of work for more than a year because he was unable to find a job. (*Id.*, Tr. 419). Plaintiff also reported that he was disabled due to chest pain, diabetes, and heart stents. (*Id.*, Tr. 418). Plaintiff stated that although he had disagreements with supervisors in the past, he had no problems following instructions or performing repetitive tasks. (*Id.*, Tr. 419). Plaintiff spent his time at home, sleeping and doing yard work. (*Id.*, Tr. 420). Dr. Reece observed that Plaintiff had a slight right hand tremor, but his gross motor ability appeared to be unimpaired. (*Id.*, Tr. 420). Plaintiff was alert, clear, and oriented, with fair memory, satisfactory concentration and persistence, slightly slowed pace, and direct, understandable, and well-organized speech. (*Id.*, Tr. 420–21). He appeared to be mildly anxious and dysphoric. (*Id.*, Tr. 420–31). Dr. Reece diagnosed major depressive disorder, recurrent and mild; and anxiety disorder, noting psychosocial stressors as finances and physical health. (*Id.*, Tr. 421). Dr. Reece assessed no impairment in intellectual functioning. (*Id.*, Tr. 421). Plaintiff met with Dr. Yakubov in November 2012 to follow up on his heart catheterization, complaining of increasingly frequent chest and throat discomfort. (*Id.*, Tr. 423, 558). Dr. Yakubov noted that Plaintiff did not watch his diet and consequently, his diabetes was uncontrolled. (*Id.*, Tr. 423). In response to Plaintiff's complaints of angina, Dr. Yakubov opted to perform catheterization. (*Id.*, Tr. 423). Catheterization in November 2012 showed that all stents were in place, with a well-preserved left ventricular function and good ejection fraction. (Tr. 426, 562). Dr. Yakubov recommended continued, conservative medical therapy. (*Id.*, Tr. 426, 562).

In November 2012, psychological consultant Carl Tishler, Ph.D., reviewed the evidence of record and opined that Plaintiff could work in a setting with no need for fast pace or strict production quotas, and have no more than frequent, superficial contact with coworkers, supervisors, and the general public. (*Id.*, Tr. 57, 61, 74–76). In December 2012, medical consultant Gerald Klyop, M.D., reviewed the evidence and opined that Plaintiff could perform light work with additional postural and environmental limitations. (*Id.*, Tr. 59–60, 63, 74, 77). Janet Souder, Psy.D., reviewed the evidence of record in February 2013, and agreed with Dr. Tishler's findings that Plaintiff would be limited to work without the need for fast pace or strict production quotas, and with frequent, superficial contact with coworkers, supervisors, and the general public. (*Id.*, Tr. 89–90, 97–98, 101–03). Anahi Ortiz, M.D., reviewed the evidence of record on that same day, agreeing with Dr. Klyop that Plaintiff could perform light work with additional postural and hazard limitations. (*Id.*, Tr. 86–88, 91–92, 99-101, 103–05).

    *4.  2013*

In March 2013, Plaintiff went to Six County treatment facility requesting medication management for lifelong depression and anxiety. (*Id.*, Tr. 455). Plaintiff reported that he was going through divorce proceedings due to allegations that he sexually abused his eleven-year-old adopted daughter. (*Id.*, Tr. 455). Plaintiff endorsed suicidal ideation with no specific plan—he was fixated on death and dying and sometimes went to accident and injury scenes to watch death. (*Id.*, Tr. 455). Jennifer Wilson, C.N.P., diagnosed major depressive disorder and personality disorder, and screened Plaintiff for emergency hospitalization. (*Id.*, Tr. 455–56). On March 4, 2013, Plaintiff was kept overnight at Genesis Hospital. (*Id.*, Tr. 462). While hospitalized, Plaintiff acknowledged depression for the past two months, due to separation from his wife of seventeen years and allegations of sexual abuse from his daughter, but he denied any

6

suicidal thoughts, stating that he had no plans to kill himself and should not have been hospitalized. (*Id.*, Tr. 462, 467). Plaintiff said he had applied for disability based on heart disease and hypertension (*Id.*, Tr. 463). He denied any musculoskeletal or chest pain. (*Id.*, Tr. 463). Upon examination, he had a normal gait, normal strength, and full range of motion, with no muscular wasting. (*Id.*, Tr. 463). An echocardiogram (ECG) was normal. (*Id.*, Tr. 504). On mental status examination, Plaintiff was cooperative, spontaneous, alert, and oriented, with normal speech and a depressed mood. (*Id.*, Tr. 46–64). Plaintiff reported taking Effexor, which previously helped, but was no longer effective. (*Id.*, Tr. 462). Mukesh Rangwani, M.D., diagnosed major depression and assigned a Global Assessment of Functioning (GAF) of 45. (*Id.*, Tr. 464, 467). The doctor restarted Plaintiff's Effexor and recommended outpatient counseling and medication management at Six County. (*Id.*, Tr. 467).

Plaintiff saw Ms. Wilson again on March 19, 2013, for medication management. (*Id.*, Tr. 453). Plaintiff denied suicidal ideation but remained dysphoric, with a flat affect. (*Id.*, Tr. 453). Diagnoses included major depressive disorder, generalized anxiety disorder, and personality disorder. (*Id.*). Ms. Wilson noted Plaintiff's legal issues and pending divorce, and assigned a GAF of 35. (*Id.*). Plaintiff reported past success with Prozac, so Ms. Wilson added fluoxetine to Plaintiff's medications. (*Id.*).

On March 21, 2013, Plaintiff was evaluated at the request of Children's Services. (*Id.*, Tr. 507). Plaintiff told the evaluator that he was unemployed and applying for disability. (*Id.*, Tr. 508). He reported depression, sadness, anxiety and anger due to his inability to see his children. (*Id.*, Tr. 511). Plaintiff participated in church activities, and had positive peer relationships at church, but his daily activities were limited by depression and anxiety. (*Id.*, Tr. 507). A clinician diagnosed major depressive disorder, and recommended continued outpatient

7

psychotherapy and pharmaceutical management at Six County, along with community and church support. (*Id.*, Tr. 513–14).

Plaintiff saw Albert Camma, M.D., on March 25, 2013, complaining of pain, numbness, and weakness in his right hand for several years, and recent numbness and tingling in his left hand. (*Id.*, Tr. 471). Dr. Camma recommended right-hand carpal tunnel release surgery, followed by left-hand surgery six weeks later. (*Id.*, Tr. 471). Plaintiff underwent right carpal tunnel release surgery at Genesis in early April 2013. (*Id.*, Tr. 474, 528–29, 534–35). Plaintiff met with Ms. Wilson at Six County in April 2013. (*Id.*, Tr. 445–53). Upon examination, Plaintiff had clear and linear thought processes, with no apparent impairment in memory, attention, or concentration, and no noted physical ailments. (*Id.*, Tr. 446, 448). Ms. Wilson diagnosed major depressive disorder and generalized anxiety disorder, assigned a GAF of 50, and adjusted Plaintiff's medications. (*Id.*, Tr. 449–53).

On April 24, 2013, Dr. Thompson examined Plaintiff for a vocational rehabilitation assessment. (*Id.*, Tr. 428). Plaintiff reported that he lived with his mother, and was able to do yard work, cleaning, cooking, shopping, driving, and laundry. (*Id.*, Tr. 428). His hobbies included metal detecting, hunting, and fishing, but Plaintiff was not currently doing these things due to depression. (*Id.*, Tr. 428). Dr. Thompson noted that Plaintiff had been diagnosed with sleep apnea, but was not compliant with the prescribed therapy. (*Id.*, Tr. 428). Plaintiff had a history of coronary artery disease, with chest pain and shortness of breath on exertion, but his cardiologist had never imposed functional limitations. (*Id.*, Tr. 428). Plaintiff had carpal tunnel surgery on the right hand, with some residual numbness and weakness. (*Id.*, Tr. 428). On examination, Dr. Thompson observed that Plaintiff was alert and oriented, with normal gait and station, and no motor weakness, sensory loss, or reflex changes. (*Id.*, Tr. 429). Plaintiff's right

wrist was tender to percussion. (*Id.*). Dr. Thompson diagnosed obstructive sleep apnea, status post-surgery for right carpal tunnel, depression, multiple myalgias, and coronary artery disease. (*Id.*). He opined that Plaintiff would be unable to work as a commercial driver due to sleep apnea; unable to do work that involves climbing and aerobic activity, due to his history of heart disease; and unable to do repetitive forceful work with his right hand, due to his history of carpal tunnel. (*Id.*, Tr. 429). In a checklist evaluation form, Dr. Thompson opined that Plaintiff could stand or walk up to five hours in an eight hour day, sit up to eight hours in a day, and lift up to 20 pounds. (*Id.*, Tr. 430). He could occasionally bend, squat, crawl, climb, and lift, but he could not use his hands repetitively for grasping, pushing, pulling, or fine manipulation. (*Id.*, Tr. 430). On May 3, 2013, the Ohio Rehabilitation Services Commission placed Plaintiff on a waitlist for vocational rehabilitation services, noting that Plaintiff's work tolerance was limited due to his impairments. (*Id.*, Tr. 236).

Plaintiff saw Dr. Kalis on May 20, 2013, complaining of coronary artery disease, diabetes, hyperlipidemia, and sexual dysfunction. (*Id.*, Tr. 499). Dr. Kalis noted that Plaintiff had no symptoms of heart disease and a cardiologist found little in the way of pathology. (Tr. 499). Plaintiff was noncompliant, failing to check his blood sugar regularly. (*Id.*, Tr. 499). Dr. Kalis refilled Plaintiff's current prescriptions and told Plaintiff to return in four months. (*Id.*, Tr. 499).

Plaintiff went to Six County on May 28, 2013, complaining of depression and sleep deprivation. (*Id.*, Tr. 437–44). Ms. Wilson diagnosed major depressive disorder and generalized anxiety disorder. (*Id.*, Tr. 442, 444). Two months later, on July 31, 2013, Ms. Wilson completed a checklist evaluation form, opining that Plaintiff had extreme limitations in all areas of social interaction; marked to extreme limitations in concentration and persistence; moderate limitations

9

in ability to maintain personal appearance and hygiene; and extreme limitations in all other areas of adaptation. (*Id.*, Tr. 458–60). Ms. Wilson opined that, due to depression and anxiety, Plaintiff had extreme psychomotor retardation and impaired concentration, would miss five or more days of work each month, and would be unable to maintain any type of employment. (*Id.*, Tr. 460). On September 18, 2013, Plaintiff complained to Dr. Kalis of elevated blood sugars and other problems related to diabetes. (*Id.*, Tr. 496). Plaintiff reported high blood sugar with finger stick tests, but testing in the office showed much lower results, and laboratory work showed acceptable blood sugar levels. (*Id.*, Tr. 496). Other issues included hyperlipidemia, hypertension, coronary artery disease, and depression. (*Id.*, Tr. 497). Plaintiff reported that he was continuing his treatment at Six County and although he still felt bad, he was benefitting from therapy. (*Id.*, Tr. 497). Plaintiff saw Ms. Wilson on September 25, 2013. (*Id.*, Tr. 483).

In a revised report, dated October 9, 2013, Ms. Wilson noted that Plaintiff was stable, and his symptoms were exclusively psychiatric; he had no constitutional or musculoskeletal symptoms. (*Id.*, Tr. 476–78). Plaintiff had a normal gait, appearance, and speech; appropriate mood; and clear, linear thought processes. (*Id.*, Tr. 476, 480). Plaintiff's memory was unimpaired, and his attention span and concentration were normal. (*Id.*, Tr. 479). Diagnoses included major depressive disorder and generalized anxiety disorder. (*Id.*, Tr. 481). Ms. Wilson added Abilify to Plaintiff's medications, which already included Klonopin and Cymbalta. (*Id.*, Tr. 480).

In November 2013, Plaintiff complained to Dr. Kalis of uncontrolled tremors in his arms and head for the past six months. (*Id.*, Tr. 500). On examination, Plaintiff was alert and oriented, with a slow, steady gait and a resting tremor. (*Id.*, Tr. 500). Dr. Kalis suspected Parkinson's disease and recommended that Plaintiff follow up with a neurologist, Dr. Bjornstad.

(*Id.*, Tr. 500). On November 25, 2013, after Plaintiff was unable to complete his full assigned shifts at a recycling center, a vocational rehabilitation specialist determined that Plaintiff lacked the physical stamina to engage in competitive employment and was not ready to benefit from vocational rehabilitation services. (*Id.*, Tr. 237–39). The counselor suggested that Plaintiff might consider walking more to increase his physical stamina. (*Id.*, Tr. 237). Plaintiff met with Ms. Wilson that same day for medication management. (*Id.*, Tr. 484–91). Findings on physical examination were negative, with normal gait and station although Ms. Wilson commented on significant psychomotor retardation. (*Id.*, Tr. 485–86). Plaintiff's speech was soft, clear, and linear, with no loose associations. (*Id.*, Tr. 487). His memory was unimpaired, and attention span and concentration were within normal limits. (*Id.*, Tr. 487). Plaintiff complained that Abilify had not improved his depression, so Ms. Wilson adjusted his medications. (*Id.*, Tr. 488).

    5.  2014

Plaintiff was incarcerated in January 2014. (*Id.*, Tr. 628). On January 9, 2014, during an intake assessment with the Muskingum County Sheriff, Plaintiff reported a history of diabetes, hypertension, sleep apnea, heart stents, depression, and anxiety. (*Id.*, Tr. 624-29). The next day, Plaintiff met with cardiologist Samar Khoury, M.D., at the county jail. (*Id.*, Tr. 637). Plantiff was shaking and concerned about possible Parkinson's disease but denied other symptoms. (*Id.*). Dr. Khoury placed Plaintiff on a diabetic diet (*Id.*). Law enforcement officers took Plaintiff to the Genesis-Bethesda Hospital emergency department on January 12, 2014, requesting a psychiatric evaluation. (*Id.*, Tr. 543–46, 641–46). Plaintiff had refused to eat while in jail, and his blood sugar had dropped to 51. (*Id.*, Tr. 436, 646). Plaintiff also claimed that he had not been given any insulin in jail. (*Id.*, Tr. 550). Clinicians noted that Plaintiff was evasive during questioning. (*Id.*, Tr. 547). On examination, Plaintiff was oriented and appeared to be well-

nourished and in no distress, with normal reflexes, coordination, muscle tone, and range of motion. (*Id.*, Tr. 547-48). However, he seemed depressed and had a flat affect. (*Id.*, Tr. 547–48). An ECG on January 13, 2014, was abnormal, showing possible left ventricular hypertrophy. (*Id.*, Tr. 544, 642). Plaintiff continued to refuse food after leaving the hospital. (*Id.*, Tr. 637).

On January 14, 2014, Dr. Khoury discontinued Plaintiff's diabetes medications, noting medications could resume when Plaintiff started eating again. (*Id.*, Tr. 636). He was placed on a suicide watch pending further evaluation (*Id.*, Tr. 636). On January 16, 2014, neurologist Bryan Bjornstad, M.D., evaluated Plaintiff in response to concerns about Parkinson's disease and tremors (*Id.*, Tr. 578). On examination, Plaintiff was alert and oriented, with normal motor strength, muscle tone, and reflexes, normal language, and intact gait. (*Id.*, Tr. 579). Dr. Bjornstad diagnosed probable essential tremor, and recommended magnetic resonance imaging (MRI) and laboratory testing. (*Id.*, Tr. 579). During March 2014, Plaintiff refused to eat or drink for several days. (*Id.*, Tr. 622). On April 3, 2014, Plaintiff complained of dizziness for the past week, reportedly caused by increased anxiety and depression. (*Id.*, Tr. 619). Plaintiff said he previously took Cymbalta but discontinued it because it was not helpful. (*Id.*, Tr. 619). A physician prescribed Zoloft. (*Id.*, Tr. 619).

In July 2014, while still incarcerated, Plaintiff again refused to eat or drink for several days, but denied that he was on a "hunger strike." (*Id.*, Tr. 634–35). Dr. Khoury again withheld Plaintiff's diabetes and heart medications during the fast, noting that Plaintiff was somewhat weak but his vital signs were stable. (*Id.*, Tr. 632–34). Law enforcement officers took Plaintiff to the Good Samaritan emergency department on July 3, 2014, at Dr. Khoury's direction, after Plaintiff refused food and drink for five days. (*Id.*, Tr. 589–615, 634). At the hospital, Plaintiff denied any depression or suicidal ideation but complained of intermittent chest pain. (*Id.*, Tr.

602, 605, 616). Mary Arvantis, D.O., observed that Plaintiff was alert and oriented, with normal mood, affect, and behavior. (*Id.*, Tr. 603). Chest x-rays were normal. (*Id.*, Tr. 597). Plaintiff was discharged after eating three sandwiches, drinking four cans of soda, and receiving intravenous fluids. (*Id.*, Tr. 604, 607). The ultimate diagnosis was dehydration. (*Id.*, Tr. 591).

On July 6, 2014, Dr. Khoury again discontinued Plaintiff's oral diabetes medications in response to Plaintiff's episodes of not eating. (*Id.*, Tr. 621). On July 19, 2014, Plaintiff requested to restart diabetes medications, promising he would eat. (*Id.*, Tr. 633). Dr. Khoury agreed. (*Id.*, Tr. 633).

### B. Hearing Testimony

Plaintiff waived his right to appear at the hearing on August 29, 2014. (*Id.*, Tr. 21, 41, 178). His counsel, however, appeared and stated that Plaintiff suffered from sleep apnea, depression, anxiety, diabetes, history of heart disease with stenting, obesity, essential tremor, and carpal tunnel, with a history of right-release surgery. (*Id.*, Tr. 42–43). Plaintiff's counsel also noted that the Board of Vocational Rehabilitation characterized Plaintiff as disabled. (*Id.*, Tr. 43).

In response to a hypothetical question about an individual with Plaintiff's residual functional capacity ("RFC") and vocational profile, a vocational expert testified that such an individual could perform light, unskilled work as a labeler/marker, with 210,000 positions nationally; and wrapper, with 150,000 positions nationally; and sedentary, unskilled work as an order clerk, with 180,000 positions nationally; and grader, with 210,000 positions nationally. (*Id.*, Tr. 46–47). A limitation to occasional lifting and reaching or use of only the non-dominant hand would preclude all work. (*Id.*, Tr. 47).

13

## II. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To that end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 1:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III. DISCUSSION

Plaintiff has assigned two errors. (*See generally* Docs. 13, 15).

### A. RFC Determination

Plaintiff first challenges the ALJ's RFC determination that Plaintiff "can frequently use his upper extremities for handling, fingering, and feeling." Plaintiff claims the ALJ had no support in the record for such a conclusion. (Doc. 13 at 6–11).

An RFC assessment describes the most a claimant can do after considering the effects of all impairments on his ability to perform work-related tasks. *See* 20 C.F.R. § 404.1545. Although the RFC must be supported by evidence of record, it need not correspond to, or even be based on any specific medical opinion. *See Brown v. Comm'r of Soc. Sec.*, 602 F. App'x 328, 331 (6th Cir. 2015). Instead, an ALJ has the duty to formulate a claimant's RFC based on all the

14

relevant, credible evidence of record, medical and otherwise. *See Justice v. Comm'r of Soc. Sec.*, 515 F. App'x 583, 587 (6th Cir. 2013); *see also* 20 C.F.R. § 404.1545; SSR 96-8p.

Relevant to Plaintiff's ability to use his upper extremities, the ALJ noted the following medical records:

> In December 2011, the claimant was noted to have a very slight head tremor and mild central tremor of his hands; however, his physician provided that "there is not enough to treat" (Exhibit 4F p. 4). Further, while the claimant had a neurological evaluation on January 16, 2014 (during his incarceration) to evaluate his complaints of tremor in the head, voice, and upper extremities (right greater than left), physical exam showed only mild head tremor and bilateral upper extremity action/terminal tremor with persevered sensory modalities and normal muscle strength (Exhibit 17F). An MRI of his brain, also completed in January 2014, was negative (Exhibit 20F p. 21).
>
> In August 2012, he was noted to have carpal tunnel syndrome in his hands, which had continued to cause him some difficulty in his right hand despite having had surgery (Exhibit 4F p. 6). In April 2013, the claimant underwent right carpal tunnel release without complication after an EMG/NCV of his upper extremities revealed bilateral carpal tunnel syndrome, which was more severe on the right. (Exhibit 1lF p. 1; *See also* Exhibit 15F). I note that the claimant was cleared for surgery by his cardiologist *(Id.)*. No post-operative complications were noted.

(Doc. 11, Tr. 28).

The ALJ also relied on Plaintiff' ability to dress, groom, feed, and bathe himself independently. (*Id.*, Tr. 29, 428). Relatedly, the ALJ noted that Plaintiff could do housework, such as cleaning, mopping and sweeping; groom pets, including clipping nails and trimming fur; play games on the computer; drive; and engage in hobbies such as hunting, fishing, coin collecting and metal detecting—all activities that require some degree of manipulative ability. (*Id.*, Tr. 24–26, 250–52, 428).

In addition, the ALJ relied on the state-agency medical consultants who found that Plaintiff had no limitations with the use of his upper extremities. (*Id.*, Tr. 30, 59–63, 74–77, 86–

88. 99–101, 103–05). The ALJ acknowledged that those opinions were rendered before Plaintiff's carpel tunnel surgery but concluded that subsequent evidence of a hand limitation did not reduce their probative value because the opinions were consistent with the record as a whole. (*Id.*, Tr. 30; *see also id.*, 59–63, 74–77, 86-88. 99–101, 103–05). The Court concludes that it was within the ALJ's discretion to value the opinion of the state-agency opinions in this way. *See Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015).

Plaintiff counters that the ALJ should have relied more heavily on the opinion of Dr. Thompson who examined Plaintiff. On this point, the ALJ noted that Dr. Thompson was not a treating source and thus not entitled to deference. (*Id.*, Tr. 30). Ultimately, the ALJ gave "minimal weight" to Dr. Thompson's opinion because it was based on Plaintiff's "subjective complaints" and was "inconsistent with the totality of medical evidence of record." (*Id.*) The ALJ's reasons for discounting Dr. Thompson's opinion are sufficient. *See, e.g.*, *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) (exhaustive factor-by-factor analysis is not required); *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009) (one-sentence rejection of) And, considering the record as a whole, substantial evidence supports the ALJ's RFC determination. Accordingly, the undersigned rejects Plaintiff's first argument.

### B. Evaluation of Ms. Wilson's Opinion

Plaintiff next argues that the ALJ erred in dismissing Ms. Wilson's findings regarding Plaintiff's mental limitations without articulating a proper reason, in violation of SSR 06-3p. (Doc. 13 at 12). In a form completed in July 2013, Ms. Wilson opined that Plaintiff had extreme limitations in all areas of social interaction; marked to extreme limitations in concentration and persistence; moderate limitations in ability to maintain personal appearance and hygiene; and extreme limitations in all other areas of adaptation. (Doc. 11, Tr. 458–60).

16

Contrary to Plaintiff's argument, the ALJ identified several appropriate reasons for assigning minimal weight to Ms. Wilson's opinion. (*See generally id.*, Tr. 31). First, the ALJ observed that Ms. Wilson, a nurse practitioner, is not an acceptable medical source as defined in the regulations, but instead is an "other source." (*Id.*, Tr. 31). *See* 20 C.F.R. §§ 404.1502, 404.1513. As such, her opinion is not entitled to controlling weight. *See* SSR 06-03p; 20 C.F.R. § 404.1527(c). Even so, the ALJ then considered the opinion in accordance with the guidance in SSR 06-03p. In particular, he considered the length and nature of the relationship between Ms. Wilson and Plaintiff, the consistency of Ms. Wilson's opinion with other evidence of record, and the extent to which Ms. Wilson's opinion was explained and supported. *See* SSR 06-03p. The ALJ observed that when Ms. Wilson rendered her opinion in July 2013, she had seen Plaintiff only four times over a several-month period in 2013. (*Id.*, Tr. 31, *see also id.*, 437–56). The ALJ concluded that this relationship was too short lived to justify great reliance. (*Id.*, Tr. 31, 458-60). Such a conclusion was within the ALJ's discretion. *See* 20 CFR § 404.1527(c)(2); *see also Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 506-07 (6th Cir. 2006).

The ALJ further noted that the extreme limitations in Ms. Wilson's opinion were "significantly inconsistent" with her findings on mental status examinations, as well as Plaintiff's reported daily activities, Dr. Reece's findings, and other medical evidence of record. (*Id.*, Tr. 31). Contrary to the extreme limitations and impaired concentration referenced in her opinion, Ms. Wilson's treatment notes indicate that Plaintiff had clear, linear thought processes; normal attention and concentration; and no impairment in memory. (*Id.*, Tr. 440, 448, 458–59). Ms. Wilson's opinion was also inconsistent with the assessment of consultative psychologist Dr. Reece, who found that Plaintiff had fair memory, and satisfactory concentration and persistence (*Id.*, Tr. 420–22). Consistent with Dr. Reece's assessment, Plaintiff himself represented that he

17

had no problems following instructions or performing repetitive tasks. (*Id.*, Tr. 419). All told, it was within the ALJ's discretion to assign minimal weight to Ms. Wilson's opinion, and the ALJ's ultimate conclusion regarding Plaintiff's mental abilities finds support in the record.

## IV. CONCLUSION

For the reasons stated, it is **RECOMMENDED** that the Plaintiff's statement of errors be **OVERRULED** and that judgment be entered in favor of Defendant.

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a *de novo* determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.

Date: March 16, 2017                              <u>s/ Kimberly A. Jolson</u>
                                                  KIMBERLY A. JOLSON
                                                  UNITED STATES MAGISTRATE JUDGE